1

2

3                                                                    O

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10

11  ELEMENTS SPIRITS, INC., a        )  Case No. CV 15-02692 DDP (AGRx)
    California corporation;          )
12  FABRICA DE TEQUILAS FINOS        )  **ORDER DENYING MOTION FOR**
    S.A. De C.V., a Mexican          )  **PRELIMINARY INJUNCTION**
13  corporation; WORLDWIDE           )
    BEVERAGE IMPORTS, LLC, a         )  [Dkt. No. 12.]
14  Nevada limited liability         )
    company,                         )
15                                   )
                     Plaintiffs,     )
16                                   )
         v.                          )
17                                   )
    ICONIC BRANDS, INC., a           )
18  California corporaiton;          )
    GRACE KIM BRANDI, an             )
19  individual,                      )
                                     )
20                   Defendants.     )
    _____ )
21

22       Presently before the Court is Plaintiffs' Motion for

23  Preliminary Injunction.  (Dkt. No. 12.)  Having heard oral argument

24  and considered the parties' submissions, the Court adopts the

25  following order.

26  **I.    BACKGROUND**

27       Plaintiffs and Defendants both sell tequila in bottles shaped

28  and painted to resemble "calaveras," folk art sculptures of skulls

1   traditionally produced for the Mexican Day of the Dead celebration.

2   Plaintiffs sell under the name "KAH Tequila," while Defendants sell

3   under the name "Sangre de Vida."  (Pls.' Mem. P. & A. at 1, 3;

4   Decl. Grace Kim Brandi, ¶ 3.)  Plaintiffs' packaging and

5   Defendants' packaging are nearly, though not exactly, identical.

6        The exact origin of the bottle design is disputed.  Defendant

7   Brandi alleges that she came up with the idea, sculpted models from

8   clay in her kitchen, and sought out a glassware manufacturer to

9   produce prototypes.  (Brandi Decl., ¶¶ 3-5; Pls.' Ex. PP.)  She

10  provides a declaration from the glassware manufacturer stating that

11  she sent him the models in "the summer of 2009."  (Decl. Zou Meng.)

12  She also provides a declaration from her former attorney stating

13  that she presented him with the prototypes in October 2009.[1]

14  (Decl. Thomas Ziegler.)  Plaintiffs, on the other hand, allege that

15  the bottles were designed by Los Angeles street artists Javier

16  Gonzales and Sandra Lugo and provides the Court with copies of

17  _____

18      [1]Plaintiffs object to the declaration of Mr. Ziegler on the
    ground that he previously represented Elements in the Globefill
19  litigation, described infra.  (Pls.' Ev. Obj. at 5.)  Plaintiffs
    cite to Cal. R. Prof. Conduct 3-310(E), which states that an
20  attorney "shall not, without the informed written consent of the
    client or former client, accept employment adverse to the client or
21  former client where, by reason of the representation of the client
    or former client, the member has obtained confidential information
22  material to the employment."  However, Mr. Ziegler has not accepted
    any employment by submitting his declaration, distinguishing this
23  case from Brand v. 20th Century Ins. Co., 124 Cal.App.4th 594
    (2004), in which an attorney was hired as an expert witness, for
24  pay, against his former client.  Mr. Ziegler also does not violate
    Cal. R. Prof. Conduct 3-100 or Cal. Bus. & Prof. Code § 6068(e)(1),
25  which require attorneys to "maintain inviolate the confidence, and
    at every peril to himself or herself to preserve the secrets, of
26  his or her client."  Here, the only information disclosed is the
    fact that Defendant Brandi had the bottle prototypes in her
27  possession in October 2009.  That information is not secret or a
    confidence, nor was Elements a client of Mr. Ziegler's at the time
28  he learned that information, inasmuch as it was not formed until
    the following month.

"work for hire" agreements with those artists for unspecified "artwork." (Pls.' Mem. P. & A. at 3; Pls.' Exs. A, B.) Defendant Brandi alleges, however, that Gonzales and Lugo were hired only to create ancillary promotional artwork, not the bottle designs themselves. (Brandi Decl., ¶ 7.) Brandi has, however, stated in the course of another lawsuit, under penalty of perjury, that she was "inspired" by the work of Lugo and Gonzales. (Pls.' Ex. FF, ¶ 8.) The parties have signed an agreement that requires Plaintiffs to acknowledge Defendant Brandi as the "original creator of the KAH skull-shaped bottles and the KAH brand, in response to public or private inquiries." (Pls.' Ex. N.)

The parties agree that it was Brandi who formed the company Elements in November of 2009 and prepared to launch the KAH brand in early 2010. (Pls.' Mem. P. & A. at 3-4.) In March 2010, however, Elements and Brandi were both sued by Globefill, Inc., which sells vodka in a skull-shaped bottle. (Pls.' Ex. DD.) As the company did not yet have any substantial assets, Brandi and Elements entered into an arrangement with Timothy Owens and Worldwide Spirits, Inc. ("Worldwide"), facilitated by Federico Cabo, in which Worldwide would acquire 51% of the ownership interest in Elements. (Pls.' Mem. P. & A. at 4-5; Brandi Decl., ¶ 9.) Defendant Brandi alleges that as part of its consideration in the agreement, Worldwide agreed to "assume the defense of the Globefill litigation." (Brandi Decl., ¶ 9.) However, Plaintiffs dispute this point, noting the Common Stock Purchase Agreement does not mention any defense of the Globefill litigation. (Pls.' Ev. Obj. at 2; Pls.' Ex. F ("Common Stock Purchase Agreement").)

1     What happened next is not entirely clear.  Defendant Brandi
2  alleges that another company controlled by Cabo, Worldwide Beverage
3  Imports ("WBI"), "took over ELEMENTS' role as the importer and
4  distributor of KAH Tequila."  (Brandi Decl., ¶ 10.)  According to
5  Brandi, Elements "was to receive a 'substantial' royalty" from WBI.
6  (Id.)  Plaintiffs allege, on the other hand, that on October 23,
7  2010, Elements entered into a trademark assignment agreement with
8  Fabrica de Tequilas Finos ("Finos"), a company for which Cabo is a
9  "consultant" – a role whose parameters are not clear to the Court.
10  (Decl. Federico Cabo; Pls.' Ex. J ("Trademark Assignment and
11  Royalty Agreement").)  Plaintiffs' copy of the alleged agreement
12  between Elements and Finos states that royalty payments were to be
13  credited against the cost of defending the Globefill litigation.
14  (Pls.' Ex. J, §4.2.)  According to Plaintiffs, Finos then
15  contracted with WBI to import "KAH" tequila.  (Pls.' Mem. P. & A.
16  at 6:9-12.)  After these arrangements took place, the Globefill
17  litigation continued to a jury trial.  It is currently on appeal
18  with the Ninth Circuit.  Plaintiff alleges that attorney's fees to
19  date in that case have run well over one million dollars.  (Pls.'
20  Ex. JJ, Decl. Federico Cabo, ¶ 20.)

21     The parties agree that Defendant Brandi was removed from
22  Elements as CEO and as a director in April 2011, although she
23  retained ownership of a good deal of stock.  (Brandi Decl., ¶ 12;
24  Pls.' Mem. P. & A. at 6.)  In August 2011, Brandi registered five
25  copyrights in the bottle designs, including the sculpted shape of
26  the bottles.  (Brandi Decl., Exs. 1-5.)

27     In the course of mediation during the Globefill litigation,
28  Elements and Brandi entered into a "binding agreement" providing

1  for payment of certain of Brandi's legal fees and, crucially,
2  providing for a license of Brandi's copyrights to Elements:

3       Brandi shall provide Elements with a permanent, worldwide,
4       exclusive, royalty-free license in any and all copyrights
5       owned by Brandi relating to skull-shaped bottles and/or the
6       KAH brand, which license shall not be subject to termination,
7       provided that Elements is not in breach of its obligations to
8       pay Brandi her pro rata share of any annual distributions made
9       to shareholders of Elements.

10 (Pls.' Ex. N.)  Defendant Brandi alleges that Elements has breached
11 the agreement in numerous ways, including by failing to credit her
12 as the creator of the KAH bottles and brand, failing to enter into
13 a "more formal" agreement afterward, failing to hold a "proceeding"
14 as to who the shareholders in Elements were, and failing to either
15 distribute profits or account for its finances.  (Brandi Decl., ¶¶
16 17-20.)  Defendant Brandi further alleges that she has learned from
17 other sources that Elements' sales of KAH tequila worldwide are
18 around $75 million.  (Id. at ¶ 22.)  She and her new company,
19 Defendant Iconic Brands, therefore launched a new tequila line,
20 called "Sangre de Vida," in bottles nearly identical to the KAH
21 bottles.  (Id. at ¶ 21; Pls.' Mem. P. & A. at 8.)  In response to
22 cease-and-desist letters from Elements, Brandi's attorney declared
23 that the "binding agreement" had been terminated.  (Pls.' Exs. KK,
24 LL.)  Brandi also sent cease-and-desist letters to distributors of
25 KAH.  (Brandi Decl., ¶ 22.)  Plaintiffs then filed this lawsuit,
26 alleging trade dress and trademark infringement, unfair
27 competition, interference with contract, and breach of contract.
28 (Dkt. No. 1.)

**II.   LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Alternatively, if success on the merits is not shown to be likely, "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," if the plaintiff also satisfies irreparable harm and public interest prongs.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (ellipsis and internal quotation marks omitted).

**III. DISCUSSION**

Plaintiffs seek a preliminary injunction to prevent Defendant Brandi from "sending any further cease and desist letters, or making any statement to any parties or individuals asserting that she owns the KAH copyrights or any other statement that interferes with the sale of KAH tequila brand products," and to prevent both Defendants from using "the calavera shaped bottle with Day of the Dead designs."  (Mot. Prelim Inj., ¶ 8.)  As both requested injunctive orders would have to rely on the same factual premises – namely, that Plaintiffs hold valid trade dress rights in the calavera bottles and that Defendant Brandi has granted them an exclusive license to her copyrights – the Court considers both together, noting differences along the way as necessary.

**A.   Likelihood of Success on the Merits**

1    To satisfy the <u>Winter</u> test, <u>supra</u>, the plaintiff must show "a

2    likelihood of success on the merits."  <u>Winter</u> confirmed and

3    clarified an equitable test long applied by the courts, and the

4    meaning of "likelihood of success" had been discussed by pre-<u>Winter</u>

5    cases as meaning "a strong likelihood of success" or "probable

6    success."  <u>Johnson v. California State Bd. of Accountancy</u>, 72 F.3d

7    1427, 1430 (9th Cir. 1995).  At a minimum, it must be something

8    more than just "a fair chance of success," which is the standard

9    applied to an alternative test that survives, in part, as the

10   "serious questions" test discussed below.  <u>See</u> Part III.B., <u>infra</u>.

11   **1.    Trademark Infringement Versus Copyright Infringement**

12   In the memorandum accompanying the motion, Plaintiffs lay out

13   a prima facie case that they have established a trade dress right

14   in the calavera bottles.  Such a right can be established in a

15   product dress when the dress is nonfunctional; the dress serves as

16   an identification of the product's source (either because it is

17   inherently distinctive or because it has acquired "secondary

18   meaning"); and there is a likelihood that consumers would be

19   confused as to the source of the defendant's product.  <u>Clicks</u>

20   <u>Billiards, Inc. v. Sixshooters, Inc.</u>, 251 F.3d 1252, 1258 (9th Cir.

21   2001).  Defendants do not directly dispute the elements of

22   Plaintiffs' trade dress argument.  (Opp'n at 12-13.)  Instead, they

23   assert that Plaintiffs' trade dress, even if established, infringes

24   Brandi's copyright in the calaveras skull designs.  (<u>Id.</u>)

25   The universe of cases that deal with conflicts between

26   trademarks and copyrights is small and not fully developed.  The

27   general rule stated by the leading treatise is that the two kinds

28   of intellectual property are different, and the acquisition of one

7

1    is not a defense to an allegation of infringement of the other.  1

2    McCarthy on Trademarks and Unfair Competition § 6:14 (4th ed.).

3    However, the cases that rule is based on are worth discussing,

4    because their holdings do not create an easily applied rule.

5        In Boyle v. United States, the Federal Circuit was faced with

6    the question of whether the United States government authorized or

7    consented to copyright infringement by registering the alleged

8    infringer's trademark.  200 F.3d 1369, 1373 (Fed. Cir. 2000).  The

9    court concluded that it did not, because "although the grant of a

10   service mark registration entitles the registrant to certain rights

11   and privileges under the Trademark Act, the right to infringe

12   another's copyright is not one of those rights."  Id. (citation

13   omitted).

14       In Nova Wines, Inc. v. Adler Fels Winery LLC, the court held

15   that the holder of a copyright in certain photos of Marilyn Monroe

16   could not license those photos to be used on a wine bottle, because

17   a competing wine company had a valid trade dress right in "the use

18   of Marilyn Monroe's name and image on wine labels."  467 F. Supp.

19   2d 965, 983 (N.D. Cal. 2006).  Citing Boyle for the rule that a

20   trademark does not grant the holder a right to infringe a

21   copyright, the Nova Wines court held that the "complementary

22   conclusion is that a valid copyright does not entitle the copyright

23   holder to infringe another's trade dress rights."  Id.  Thus,

24   "Plaintiff's trade dress rights . . . entitle it to prevent TKS

25   from exercising the narrow portion of its copyright interests

26   consisting of licensing images of Marilyn Monroe for use on wine

27   bottles."  Id.

28

1      Finally, in <u>Univ. of Alabama Bd. of Trustees v. New Life Art,</u>
2  <u>Inc.</u>, the Eleventh Circuit held that a painter's copyrights in
3  paintings that depicted a university's trademarked sports uniforms
4  did not provide blanket protection against a trademark infringement
5  claim against him by the university, at least as to reproduction of
6  the painting on ancillary "mundane" goods like coffee mugs.  683
7  F.3d 1266, 1280 (11th Cir. 2012) (citing <u>Nova Wines</u>, 467 F. Supp.
8  2d at 983).  "If it were otherwise," the court noted, "a person
9  could easily circumvent trademark law by drawing another's
10  trademark and then placing that drawing on various products with
11  impunity."  <u>Id.</u>

12      Plaintiffs argue that <u>Nova Wines</u> shows that Defendants cannot
13  assert copyright as a defense to trademark infringement.
14  Defendants, in turn, point out that in that case, "the plaintiffs'
15  trade dress did <u>not</u> include the defendant's copyrighted pictures,
16  so there was no issue of copyright infringement."  (Opp'n at 23.)
17  In this case, Defendants argue, "plaintiffs' alleged trade dress
18  consists entirely of BRANDI's copyright."  (<u>Id.</u>)

19      Defendants raise an important point: although copyright is
20  not, by itself, a defense to trademark infringement, a trademark
21  consisting entirely of someone else's copyrighted material is
22  presumably invalid.  A bottler could not market "Citizen Kane
23  Cola," for example, with Orson Welles' beefy newspaperman plastered
24  all over the package, without seeking the permission of the owner
25  of the film's copyright.  <u>See</u> 17 U.S.C. § 106 (copyright is an
26  "exclusive" right to "reproduce the copyrighted work" and to
27  "prepare derivative works based upon the copyrighted work").  This
28

1  would be true even if the bottler could otherwise establish the
2  elements of trade dress.

3      Indeed, <u>University of Alabama</u> makes this very point.  Although
4  the positions of the trademark holder and the copyright holder in
5  that case were the opposite of what they are here, the general
6  principle is the same.  Just as one may not draw another's
7  trademark, copyright the drawing, and thereby evade trademark law,
8  one also may not appropriate another's copyrighted work as one's
9  trademark, place it into use so as to create secondary meaning and
10  customer brand familiarity, and thereby evade copyright law.

11      Thus, if Plaintiffs' trade dress infringes Defendant Brandi's
12  copyrights in the calavera skull bottle designs, there is no trade
13  dress right, Plaintiffs' satisfaction of the trade dress elements
14  notwithstanding.

15  **2.  Validity of Brandi's Copyrights**

16      A registered copyright "made before or within five years after
17  first publication of the work shall constitute prima facie evidence
18  of the validity of the copyright and of the facts stated in the
19  certificate."  17 U.S.C. § 410(c).  Brandi holds copyright
20  registration certificates in the calavera designs, and therefore it
21  is presumed, as an initial matter, that she holds valid copyrights
22  in them.  That presumption may be rebutted, however, if Defendants
23  can "offer some evidence or proof to dispute or deny the
24  plaintiff's prima facie case of infringement."  <u>United Fabrics</u>
25  <u>Int'l, Inc. v. C&J Wear, Inc.</u>, 630 F.3d 1255, 1257 (9th Cir. 2011).

26      Plaintiffs allege that the bottle designs were created by "two
27  street artists from Los Angeles, Javier Gonzales and Sandra Lugo.
28  (Pls.' Mem. P. & A. at 3.)  Plaintiffs provide exhibits to show

that Gonzales and Lugo signed letters of intent to enter into a work-for-hire arrangement with Elements in November 2009 and then actually signed work-for-hire agreements in January 2010. (Pls.' Exs. A, B.)  Plaintiffs therefore contend that Elements, rather than Brandi, was the creator or author of the bottle designs. (Pls.' Mem. P. & A. at 4.)

Plaintiffs' exhibits, however, show only that Gonzales and Lugo were hired to create *some* artwork in January 2010; they do not show that the artists were hired to create the calavera bottle designs specifically.  Nor do Plaintiffs present, say, sworn declarations by the artists confirming that the bottles were the "artwork" referred to in the agreements.  The only other competent witness who could fill in the meaning of that term in the agreements would appear to be Brandi herself, but she states in a sworn declaration that Gonzales and Lugo were hired to do ancillary artwork, not to design the bottles.  (Brandi Decl., ¶ 7.)  She also provides declarations from her former lawyer and the manufacturer of the prototypes confirming that she had fixed the designs in a tangible medium well before November 2009, let alone January 2010.[2] (Meng & Ziegler Decls.)

Plaintiffs have therefore not provided any meaningful evidence to show that Brandi's copyright is invalid.

_____

[2]If Brandi's proffered evidence is accurate, her copyright likely dates from sometime in the summer of 2009.  "Copyright protection subsists from the moment the work is 'fixed in any tangible medium of expression.'"  <u>S.O.S., Inc. v. Payday, Inc.</u>, 886 F.2d 1081, 1085 (9th Cir. 1989) (quoting 17 U.S.C. § 102(a)).

**3.    Effect of the Licensing Agreement**

Although Brandi at this point enjoys the presumption of validity in her copyrights, however, that copyright would not prevent Plaintiffs from obtaining legitimate trade dress rights in the bottle designs if there were an effective license agreement authorizing them to use the copyrighted works as their trade dress. Indeed, there may be many instances in which, for example, the copyright to a design is owned by one company and licensed to a parent, subsidiary, or sibling company for use in trade dress.

Plaintiffs allege that the binding agreement reached in mediation gives them a "permanent, worldwide, exclusive, royalty-free license" to use the bottle designs. (Pls.' Ex. N, ¶ 12.) Plaintiffs allege that this license is "not . . . subject to termination, provided that Elements is not in breach of its obligations to pay Brandi her pro rata share of any annual distributions made to shareholders of Elements." (Pls.' Ex. N.) Plaintiffs argue that where a copyright holder provides another with a license to use the copyrighted material, pursuant to a valid licensing agreement, a claim for infringement lies only when the licensee violates a "condition" of the license. See, e.g., MDY Indus., LLC v. Blizzard Entm't, Inc., 629 F.3d 928, 940 (9th Cir. 2010). "Conditions" of the license are terms of the agreement which limit the scope of the license and; other terms of the agreement are ordinary covenants, remediable by a breach of contract claim rather than a claim for infringement. Id.

Defendants do not dispute that Plaintiffs and Defendant Brandi signed the binding agreement. But they allege that Elements is, indeed, in breach of the obligation to distribute Brandi's share of

1   the profits as well as several other key terms of the agreement,

2   that the license is therefore terminated, and that as a result they

3   cannot be held liable for trade dress infringement.

4       Elements' license is in doubt for three reasons.  First,

5   Plaintiffs admit that if a condition attached to the license is not

6   met, the license falls.  The obligation to pay Defendant Brandi her

7   pro rata share profit distributions limits the temporal scope of

8   the license and is therefore a "condition" of the license, the

9   violation of which could give rise to a claim for copyright

10  infringement and which could also invalidate Plaintiffs' claims for

11  trade dress infringement.

12      Plaintiffs assert that Elements is "not in breach of its

13  obligations to pay Brandi her pro rata share of any annual

14  distributions," because no such distributions have been made.

15  Plaintiffs note, correctly, that the decision to make distributions

16  to shareholders ordinarily falls under the "business judgment

17  rule," which requires "deference to the business judgment of

18  corporate directors in the exercise of their broad discretion in

19  making corporate decisions."  Barnes v. State Farm Mut. Auto. Ins.

20  Co., 16 Cal. App. 4th 365, 378 (1993).  "It is thus the general

21  rule that a court will not interfere with a corporate decision to

22  withhold dividends in the absence of a showing of abuse of the wide

23  discretion which the courts grant to corporate directors."  Id. at

24  378.  The business judgment rule does not apply, however, where the

25  action is taken "without reasonable inquiry, with improper motives,

26  or as a result of a conflict of interest."  Everest Investors 8 v.

27  McNeil Partners, 114 Cal. App. 4th 411, 430 (2003).  Improper

28  motives include bad faith and fraud.  Id. at 432.  "[T]he rule

cannot be held to supplant the implied covenant of good faith and fair dealing." Notrica v. State Comp. Ins. Fund, 70 Cal. App. 4th 911, 925 (1999).

Plaintiffs are entitled to the presumption that Elements' corporate directors have made the decision not to make distributions in good faith. Lee v. Interinsurance Exch., 50 Cal. App. 4th 694, 715 (1996). However, in this case, Defendants raise serious questions potentially rebutting that presumption. Defendants allege that Plaintiffs have transferred all the value of Elements – its goodwill and profit streams – to other companies, while attributing (possibly bogus) expenses to Elements, intentionally and expressly leaving the company an "insolvent," unprofitable shell. (Brandi Decl., ¶¶ 10-12.) Defendants allege that sales of KAH tequila worldwide are around $75 million – an amount that is more an order of magnitude larger than the alleged amounts of the Globefill legal fees. (Id. at ¶ 22.) This number is not supported by documentation, but it is consistent with Brandi's allegation that she had already sold around $4 million in orders before she was voted out of her position in early 2011, (id. at ¶ 12), and it is also consistent with Richard Cabo's statement that "KAH tequila is sold throughout the United States at most major retail stores, including, but not limited to, Costco, BevMo, Walgreens, Pavilions, Whole Foods, Cost Plus, Kroger, and Bristol Farms, and is distributed in all 50 states by over 70 distributors, including many of the largest U.S. distributors of alcoholic beverages." (Decl. Richard Cabo, ¶ 2.)

Plaintiffs, on the other hand, provide no specific figures as to sales, expenses, or profit other than the estimated costs of

14

their legal fees in the _Globefill_ matter.  Elements President
Timothy Owens states, in a cursory declaration, that the company
has not made any distributions of profits because it has received
no profits: "Elements has not received any of the royalties it
accrued under its trademark assignment and royalty agreement with
[Finos], since the legal fees continue to exceed the royalties
owed."  (Suppl. Decl. Timothy Owens.)  However, Owens provides no
information as to the sales of KAH or the royalties earned to date.
In any event, the fact that Elements is stuck with the legal bills
and does not earn any profits, if true, would seem to be consistent
with Defendant Brandi's narrative of a bad-faith hollowing of the
corporate entity.

     Of course, the Court must consider the fact that Defendants'
allegations are supported largely by a single declaration by an
interested party, Brandi, and bolstered chiefly by a lack of hard
information from Plaintiffs.  But what other evidence, prior to
discovery, could Brandi have supplied?  She has no access to the
companies' books and has not yet been able to depose corporate
officers.  Her factual allegations are reasonably specific given
the lack of opportunity for discovery and, if true, would support a
finding that the business judgment rule does not apply.

     Thus, Plaintiffs may not succeed on the merits because they
have not adequately fulfilled the condition attached to the
license.

     However, Plaintiffs might also not have a license for another,
possibly simpler reason: they may have materially breached the
contract.  "[U]nder federal and state law a material breach of a
licensing agreement gives rise to a right of rescission which

1  allows the nonbreaching party to terminate the agreement.  After

2  the agreement is terminated, any further distribution would

3  constitute copyright infringement." Rano v. Sipa Press, Inc., 987

4  F.2d 580, 586 (9th Cir. 1993) (citations omitted). See also

5  Fosson v. Palace (Waterland), Ltd., 78 F.3d 1448, 1455 (9th Cir.

6  1996) (same); Costello Publishing Co. v. Rotelle, 670 F.2d 1035,

7  1045 (D.C.Cir.1981) ("[E]ven if the counterclaims asserted merely

8  constitute a breach of contract, an action for copyright

9  infringement would lie if the breach is so material that it allows

10 the grantor power to recapture the rights granted . . . .")

11     Apart from the possible failure to distribute profits

12 discussed above, at a minimum the record appears to show that

13 Elements has breached the term of the agreement requiring it to

14 "accord Brandi full credit as the original creator of the KAH

15 skull-shaped bottles and the KAH brand, in response to public or

16 private inquiries." (Pls.' Ex. N, ¶ 10.)  Plaintiffs' own moving

17 papers deny Brandi full credit as the creator of the bottles.

18 (Mem. P. & A. at 3 ("[I]n January 2010, Elements entered into 'work

19 for hire' agreements with [Javier Gonzales and Sandra Lugo] to

20 create the artwork for the bottles . . . .").)  This

21 characterization is consistent with Defendants' assertions that

22 Plaintiffs deleted references to her as the brand creator on the

23 corporate website and "began to attribute the creation of the

24 product to employees of ELEMENTS." (Brandi Decl., ¶¶ 14, 19.)

25     It is not clear on this record whether the covenant to give

26 Brandi full credit as the creator of the bottles and the brand is

27 so important to the contract that breach of it would constitute a

28 material breach.  But the history of litigation between the parties

suggests that the "full credit" term may have been a critical term. See Complaint, Elements Spirits, Inc. v. Brandi, No. 8:12-cv-00510-DOC-MLG (Apr. 4, 2012) (initiating lawsuit alleging that Sandra Lugo, not Brandi, designed the bottles and that Brandi committed fraud on the Copyright Office when she registered her copyrights).

Even apart from the litigation history, recognition as the creator of a work of art is a strong interest for many artists, both for personal reasons and because of the ultimate pecuniary value of that recognition. See, e.g., 17 U.S.C. § 106A (providing authors of visual works of art with "right[] of attribution"); Smith v. Montoro, 648 F.2d 602 (9th Cir. 1981) (replacement of actor's name with fictitious name in film credits was grounds for claim under Lanham Act); Meta-Film Associates, Inc. v. MCA, Inc., 586 F. Supp. 1346, 1362 (C.D. Cal. 1984) ("[D]efendants' alleged failure to provide plaintiff with a screen credit for having written portions of Animal House states a claim under Business and Professions Code § 17203 . . . [because]  their action involves an attempt to misappropriate another's talents and workmanship."). Indeed, providing a mechanism to give an author appropriate credit as a creator, both for moral purposes and for purposes of payment, is often a key component of negotiated contracts with artists. See, e.g., Marino v. Writers Guild of Am., E., Inc., 992 F.2d 1480, 1481-82 (9th Cir. 1993) (collective bargaining agreement gives writers' union authority to determine screenwriting credit, because "[b]oth economic benefits and the writer's status in the industry are affected by the receipt of screen credit").

1    Thus, on this record, it also appears possible that Elements

2  lost its license due to material breach of the terms of the

3  contract.

4    Finally, the allegation that Plaintiffs entered into the

5  licensing agreement in bad faith implicates the validity of the

6  agreement from the beginning.  If the various corporate directors

7  who made the key decisions and signed off on the key agreements

8  *knew* there would never be distributions of profits, then the

9  license clause in paragraph 12 of the "Binding Agreement" may be an

10  illusory promise or otherwise lack consideration, or may simply be

11  fraudulent.  In other words, the contract may simply have been

12  invalid from the start.

13    Given all this, it is an open question whether Plaintiffs have

14  a valid license.  As Plaintiffs point out in their reply brief,

15  when a licensee fails to fulfill a condition to the grant of

16  license, "the rights dependent on satisfaction of that condition

17  have not been effectively granted."  3 Melville B. Nimmer and David

18  Nimmer, Nimmer on Copyright § 10.15[A][2] (Matthew Bender, Rev.

19  Ed.).  The Court therefore cannot yet find that Plaintiffs are

20  likely to succeed on the merits on that point.[3]

21

22    [3]Plaintiffs argue that even if the terms of the agreement were
breached, Brandi's remedy was to go back to Justice Wallin to

23  arbitrate.  (Reply at 8–9; Pls.' Ex. N, ¶ 14.)  This may be true,
but the parties are not in court because Defendant Brandi alleges

24  breach of contract.  Rather, the parties are in court because
Plaintiffs allege that they have trade dress rights in the calavera

25  designs; Defendant's invocation of the terms of the license clause
is only by way of an affirmative defense, to show that Plaintiffs

26  lost their license due to bad faith failure to distribute profits.
It would be unjust of Plaintiffs to skip over arbitration

27  themselves to assert the license in this court (when it is clearly
contested) and then to assert that Defendants may not challenge the

28  license as an affirmative defense because Brandi has not

                                                    (continued...)

1    Because Defendant Brandi has a presumptively valid copyright,

2  and because Defendants raise serious questions as to whether her

3  license of that copyright to Elements remains valid, the Court

4  cannot conclude that Plaintiffs have established a likelihood of

5  success on the merits of their trade dress/trademark infringement

6  claims.

7    For similar reasons, the Court cannot conclude that Plaintiffs

8  have established a likelihood of success on the merits of their

9  interference with contract claim.  A "valid and existing contract"

10 is an element of such a claim.  Ramona Manor Convalescent  Hosp. v.

11 Care Enterprises, 177 Cal. App. 3d 1120, 1130 (1986).  The validity

12 of Plaintiffs' contracts with their distributors to sell KAH

13 tequila in the calavera bottles necessarily depends on Plaintiffs

14 having either created or licensed the intellectual property

15 underlying their alleged trade dress.  Defendants have presented

16 sufficient evidence to call that precondition to the contracts into

17 serious doubt.

18 **B.   Balance of Hardships**

19    In the Ninth Circuit, a preliminary injunction may nonetheless

20 issue, even if the plaintiff does not show a likelihood of success

21 _____

22    [3](...continued)
   arbitrated.  Plaintiffs cite no case that supports such
23 gamesmanship.

24    The Court further notes that Plaintiffs have not sought to
   compel Defendant Brandi to arbitrate before requiring her to incur
25 the cost of defending a substantive motion.  This suggests that
   Plaintiffs have simply waived their right to enforce the
26 arbitration clause, at least as to the specific questions raised in
   this motion.  Creative Telecommunications, Inc. v. Breeden, 120 F.
27 Supp. 2d 1225, 1233 (D. Haw. 1999) ("Courts have found waiver where
   the party seeking arbitration allows the opposing party to undergo
28 the types of litigation expenses that arbitration was designed to
   alleviate, such as by filing substantive motions.").

1   on the merits, if the plaintiff does raise "serious questions going

2   to the merits" and the balance of hardships "tips sharply in the

3   plaintiff's favor."  Alliance for the Wild Rockies v. Cottrell, 632

4   F.3d 1127, 1134-35 (9th Cir. 2011).

5       Here, Plaintiffs raise serious questions on the merits.  They

6   make out a prima facie case of trade dress infringement that is

7   only called into question because of the possibility that Defendant

8   Brandi holds valid copyrights and Elements no longer holds a valid

9   license to the copyrighted material.[4]

10      The balance of hardships, however, does not sharply favor

11  Plaintiffs.  To some extent this balance is zero-sum: the parties'

12  claims to this intellectual property are mutually exclusive, so

13  that the actual hardship (loss of income from one's valid trade

14  dress or copyright) can legally belong only to one side or the

15  other.

16      Thus, the Court looks to other considerations, such as the

17  relative market power and financial resources of the two sides.  In

18  Sardi's Rest. Corp. v. Sardie, for example, the Ninth Circuit

19  affirmed a district court's denial of a preliminary injunction to

20

21      [4]If Brandi does not hold a copyright, or if Plaintiffs'
22  license continues to be valid, Plaintiffs can likely also satisfy
    the elements of irreparable injury and public interest.  If
23  Plaintiffs hold valid trade dress rights, loss of income due to
    consumer confusion during the litigation period is an irreparable
24  injury, and there is a strong public interest in consumers not
    being confused as to the source of goods.  See Vision Sports, Inc.
25  v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989) ("In trademark
    infringement or unfair competition actions, once the plaintiff
26  establishes a likelihood of confusion, it is ordinarily presumed
    that the plaintiff will suffer irreparable harm if injunctive
27  relief is not granted."); Fiji Water Co., LLC v. Fiji Mineral Water
    USA, LLC, 741 F. Supp. 2d 1165, 1183 (C.D. Cal. 2010) ("The public
28  interest favors a preliminary injunction where, as here, the
    plaintiff has shown a likelihood of confusion.").

1  prevent a California restaurant from using the name "Sardi's,"

2  explaining that:

3      [T]he balance of hardships did not tip sharply in appellant's

4      favor . . . [because] the New York concern was much more

5      successful than the struggling Burbank restaurant. The more

6      established restaurant is in a better position to deal with

7      any minor identity problems that might arise than the newer

8      restaurant, which Lyle Sardie explained might not survive at

9      all without a rapid increase in local name recognition.

10  755 F.2d 719, 726 (9th Cir. 1985).  See also Philip Morris Inc. v.

11  Cigarettes For Less, 215 F.3d 1333 (9th Cir. 2000) ("We . . .

12  conclude that the district court did not abuse its discretion in

13  balancing the parties' relative hardships . . . [T]he district

14  court properly considered the relative size and economic status

15  between the parties.").

16      Similarly, in this case, it appears that Plaintiffs' brand is

17  the larger, more well-established brand.  As discussed above, the

18  brand is sold widely and may have sales in the millions or tens of

19  millions.  Federico Cabo calls the brand "successful," and Richard

20  Cabo states that the company has "spent millions of dollars over

21  the last five years developing our brand."  (Decl. Federico Cabo, ¶

22  7; Decl. Richard Cabo, ¶ 2.)  Defendants' brand, on the other hand,

23  was launched only last year and does not appear to be as well-

24  funded or as widely distributed.  (See, e.g., Decl. Federico Cabo,

25  ¶ 6 ("I have only seen the Sangre de Vida product available for

26  purchase at one store location."); Pls.' Ex. BB (email stating that

27  Sangre de Vida was "making inroads" in the market – implying that

28  the brand is not yet established).)  Thus, while the status of the

intellectual property is unclear, the larger, more established brand must bear the hardship of competition.

As to an injunction against Defendants' cease and desist letters, the balance of hardships is somewhat different.  On the one hand, Plaintiffs suffer, perhaps, a more far-reaching harm than mere loss of sales due to confusion – they may suffer reputational harm as well.  The KAH brand may be seen as legally unstable and therefore a bad investment.

On the other hand, the injunction Plaintiffs seek is a prior restraint on Defendants' speech, and as such carries "a heavy presumption against its constitutional validity." New York Times Co. v. United States, 403 U.S. 713, 714 (1971).  At best, if Plaintiffs' theory of the case is correct, Defendants' cease-and-desist letters could potentially be seen as trade libel, which is not protected speech.  But "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 390 (1973).  This is why allegedly defamatory statements, in particular, are unfit subjects for preliminary injunctions. Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 718-20 (1931).  Plaintiffs' remedy, if Defendants' letters do constitute trade libel, is a lawsuit, not a preliminary injunction.  "For whatever wrong the appellant has committed or may commit, by his publications, the state appropriately affords both public and private redress by its libel laws." Id. at 715.

///

**IV.   CONCLUSION**

Because Plaintiffs have not established a likelihood of success on the merits, nor that they have raised serious questions on the merits and the balance of hardships tilts sharply in their favor, the motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated: June 11, 2015

DEAN D. PREGERSON
United States District Judge